IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

**FILED BY** _____ **D.C.**

**APR 2 8 2025**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

| | |
|---|---|
| **DARRIN MCGILLIS d/b/a MENUDO,** | **CASE NO.** 25-cv-21921-EIS |
| **PLAINTIFF,** | |
| v. | |
| **NBCUNIVERSAL MEDIA, LLC d/b/a PEACOCK TV LLC.,** | **COMPLAINT AND JURY DEMAND** |
| **Serve on:** C T CORPORATION SYSTEM 1200 SOUTH PINE ISLAND ROAD PLANTATION, FL 33324 | |
| **DEFENDANT.** | |
| _____/ | |

1.      Plaintiff **DARRIN MCGILLIS d/b/a MENUDO** ("Plaintiff" or "MENUDO")

brings this action on behalf of himself and d/b/a MENUDO, against the Defendant

**NBCUNIVERSAL MEDIA, LLC d/b/a PEACOCK TV LLC** ("Defendant" or "NBC").

Plaintiff makes the following allegations which are based on facts and/or on personal knowledge.

**Introduction**

2.      The Plaintiff, DARRIN MCGILLIS d/b/a MENUDO, has been a critic of the

Defendant, NBCUNIVERSAL MEDIA, LLC d/b/a PEACOCK TV LLC, ("NBC") - not because

NBC does a bad job of reporting the news, but because NBC seeks to create the news. By simply

highlighting all negative information about the trade name and music group MENUDO, and

ignoring all positive information about MENUDO, NBC has sought to use its massive influence -

purportedly as a news source - to defame the name MENUDO in the minds of its viewers and

readers for the purpose of gaining viewers to its streaming service PEACOCK, culminating in

NBC claiming credit for BREAKING NEWS that is fabricated at best, and paid for lies at worst. NBC in the form of libel and slander against the name MENUDO has only escalated in recent months as legal criminal proceedings against non-parties (Eric and Lyle Menendez) are making world-wide news. As a part of its concerted effort to tilt the general public's belief in one direction, NBC has tried to taint the name MENUDO with a series of ever-more scandalous, false, and defamatory labels of "sexual," "molestation," "gay," and ultimately "homosexual" behaviors of past members of the MENUDO group. These labels are neither hyperbolic nor opinion: these are repeatedly reported as true fact, with purported factual support, by allegedly "reputable" sources, acting not merely with reckless disregard for the truth of their statements (sufficient to meet the definition of the legal standard for "actual malice") but acting with real animosity for the Plaintiff MENUDO and seeking to cause it true harm (the way "actual malice" commonly is understood). NBC has refused to correct its conduct requiring the time and expense of filing the instant lawsuit.

### Jurisdiction, Parties, and Venue

3.     Jurisdiction for this cause of action lies within this Court through 28 U.S.C. § 1332. This is an action for defamation and the parties are diverse in citizenship.

4.     The Plaintiff, DARRIN MCGILLIS d/b/a MENUDO, is a citizen and resident of the State of Florida.

5.     The Defendant, NBCUNIVERSAL MEDIA, LLC d/b/a PEACOCK TV LLC, is a corporation based and operating in the State of New York and is therefore diverse in citizenship to Plaintiff through 28 U.S.C. § 1332(c)(1).

6.     The amount of damages sought in this cause of action exceeds $75,000.00, thus meeting the requirements of 28 U.S.C. § 1332(a).

7.      The Court may exercise personal jurisdiction over the Defendant, NBC, pursuant to Fla. Stat. § 48.193(1)(a)(2) because NBC committed the tortious act of defamation within the state of Florida by broadcasting its defamatory statements to individuals within the state.[1] Further, because NBC conducts business in Florida and has registered in Florida as a foreign corporation, it has sufficient minimum contacts with the state so as to satisfy the due process requirements of the Constitution.[2]

8.      Venue is proper in the Southern District of Florida for the following reasons:

a.      The defamatory statements that form the basis of this lawsuit were published to and in the State of Florida, in addition to all over the world. As a result, NBC's defamatory statements were accessed and viewed by individuals in the State of Florida.[3] The State of Florida has a population of approximately twenty-four million people, making the alleged defamatory statements in this venue significant.

b.      Because the defamatory statements were published in the State of Florida, a substantial part of the events giving rise to the instant claim occurred in this judicial district.

---

[1] Internet Sols. Corp. v. Marshall, 39 So. 3d 1201, 1215 (Fla. 2010) ("By posting allegedly defamatory material on the Web about a Florida resident, the poster has directed the communication about a Florida resident to [viewers] worldwide, including potential [viewers] within Florida. When the posting is then accessed by a third party in Florida, the material has been 'published' in Florida and the poster has communicated the material 'into' Florida, thereby committing the tortious act of defamation within Florida."); Wendt v Horowitz, 822 So.2d 1252, 1260 (Fla. 2002) (holding that "telephonic, electronic, or written communications into Florida may form the basis for personal jurisdiction" under Florida's long-arm statute when "the alleged cause of action arises from the communications[.]").

[2] Int'l Shoe Co. v. Washington, 326 U.S. 310, 320-21 (1945) (holding that when a corporation "exercises the privilege of conducting activities within a state, it enjoys the benefits and protections of the laws of that state," thereby making it "reasonable and just according to our traditional conception of fair play and substantial justice" to permit the corporation to be sued within the state); Rose's Stores, Inc. v. Cherry, 526 So. 2d 749, 752 (Fla. Dist. Ct. App. 1988) (holding that when a foreign corporation (1) is qualified to do business in Florida, and (2) has a registered agent in the state, the "minimum contacts requirement is met.").

[3] Lowery v. McBee, 322 So. 3d 110, 117 (Fla. Dist. Ct. App. 2021) (holding that, in a defamation suit, venue is proper where the defamatory statements were published and accessed).

c.      The Plaintiff is a resident of the State of Florida.

d.      The Defendant NBC does business in the State of Florida and has registered in Florida as a foreign corporation, voluntarily choosing to have its registered agent in Broward County, which is in this Courts district.

9.      Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, and/or conspired in the false and deceptive conduct alleged herein.

## Factual Allegations

I.      **Background**

    A.  **The planed murder of music executive Jose Menendez and his wife Kitty**

10.     On August 20, 1989, José and Mary Louise "Kitty" Menendez had their lives taken at the hands of Joseph Lyle Menendez (Lyle) and Erik Galen Menendez (Erik), ("the Menendez brothers") the two adult children of both victims.

11.     In the consolidated habeas corpus appeal before the UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT, Lyle and Erik Menendez received an extensive review of the criminal case.[4]

12.     A copy of the 42-page Opinion is attached hereto as: **(Exhibit "A")**.

13.     No Netflix or other entertainment documentary can erase the evidence and hard facts reviewed by the Ninth Circuit. The Menendez brothers have received due process, and the facts and evidence are highlighted in the Courts opinion.

---

[4] Consolidated case No. 03-55863 and No. 03-56023.

**B. The 1991 fabricated allegations, and the 1992 criminal conviction for libel**

14.     NBC knew or should have known that no truth exists to label MENUDO as being involved in any criminal activity involving underaged sex with contracted members of MENUDO.

15.     The sole source for the 1991 international scandal was a man from New York City named BOLIVAR ARELLANO BEROLES ("Bolivar"). This man for countless years prior to his criminal conviction for libel was stealing hundreds of thousands of dollars from unsuspecting fans of MENUDO selling (but not limited to) illegal counterfeit copyright concert videos/films of MENUDO dubbed on generic VHS tapes.

16.     As stated by the Plaintiff on May 22, 1991, to the national news media, including Fox News and Entertainment Tonight, the fabricated allegations are the result of Bolivar's failure to successfully extort MENUDO with threats to be left alone to continue his criminal federal felonies of copyright infringement against MENUDO. Click link to watch on YouTube: https:/youtu.be/_j-2in_MD4w



17.     At no time has any contracted member of MENUDO ever stated they have encountered underaged sex with any owner and/or adult employee of MENUDO.[5]

18.     In 1992, Bolivar was criminally convicted of Libel, which in criminal cases requires a decision by a Court of guilt **beyond a reasonable doubt**. BOLIVAR WAS SENTENCED TO

---

[5] The fabricated accusations from former MENUDO member Roy Rosello are addressed separately below.

PAY A FINE OF $500.00 FOR EACH CHARGE OR ONE DAY IN JAIL FOR EVERY $5.00 WHICH HE FAILED TO PAY AND IMPRISONMENT FOR A PERIOD OF SIX HOURS WHICH TOOK PLACE ON, WEDNESDAY, JANUARY 22, 1992, AT THE JUDICIAL CENTER OF SAN JUAN. AS A RESTITUTION PENALTY, THE JUDGE ORDERED BOLIVAR TO PUBLISH A NOTICE IN A LOCAL SAN JUAN NEWSPAPER IDENTIFYING HIMSELF BY HIS COMPLETE NAME WHEREIN IT IS STATED THAT HE HAS NO EVIDENCE AT ALL TO DEMONSTRATE THE TRUTH OF HIS DEFAMATORY ACCUSATIONS.

19.     Attached is a copy of the judgement of conviction entered against Bolivar by the Criminal Court of San Juan, Puerto Rico. **(Exhibit "B")**

### C. NBC's producer Robert Rand and the elaborate scheme

20.     Robert Rand herein after referred to as ("Rand") a self-described journalist concocted a detailed, complex, and well-planned strategy involving many intricate steps and details. This scheme was not simple or straight-forward but rather has been carefully developed over the past 35 years, and contains many parts, emphasizes the careful and detailed nature of this plan.

21.     The scheme began during the Menendez brothers murder trial in which Rand intentionally and successfully rumored around the Court house that Enrique Martin Morales p/k/a Ricky Martin a former contracted member of Menudo, had been sexually assaulted by Jose Menendez on a trip to Disney land.[6]

22.     Rand was obsessed with the murder trial and convinced himself that he had to get the Menendez brothers out of jail.

---

[6] This was a complete fabricated lie.

23.    In mid 1993 Plaintiff received a telephone communication from detectives with the Beverly Hills Police Department requesting assistance getting in touch with contracted members of MENUDO during the time Jose Menendez was actively involved with the group, specifically wanting to contact Ricky Martin.

24.    In late 1994 Plaintiff received the first of what would be many telephone communications from Rand over the next 30 plus years. Rand was in Puerto Rico seeking to speak with former Menudo members and he sought out Plaintiffs contact information from a journalist at TVyNovelas Magazine of Puerto Rico.

25.    The Plaintiff invited Rand to his home in Puerto Rico to speak in person. It was during this encounter that Rand stated he interviewed Ricky Martin in a hotel room located in Mexico City, Mexico, and he secretly recorded the conversation without Mr. Martin's permission and/or knowledge.

26.    Rand stated that Ricky Martin is on recorded audio tape describing in detail being taken alone with Jose Menendez in a vehicle to Disney Land, that the car stopped, and Jose Menendez sexually assaulted him by placing his hands down Ricky Martin's pants.

27.    The Plaintiff did not hear from Robert Rand again until early 1999 when Ricky Martin's career was exploding in the American market.

28.    In May/June of 1999, the Plaintiff was receiving multiple communications from mainstream and tabloid media seeking information on Ricky Martin.

29.    In early June of 1999, a reporter named Bob Michals and his managing editor Candace Trunzo, with Globe Magazine,[7] ("Globe") was seeking information on the Menudo,

---

[7] Globe was a supermarket tabloid based in Boca Raton, Florida.

Ricky Martin and Jose Menendez connection. They each had spoken "off the record" with Robert

Rand about his alleged recorded interview with Ricky Martin.

30.    The Plaintiff informed Globe that he had no interest in being interviewed by the

magazine as Robert Rand is the source of the information. After multiple telephone

communications and monetary incentives Plaintiff agreed to be interviewed regards to the limited

"hearsay" information he could provide Globe. Plaintiff was advised it would be a story stuck in

the middle of the publication and was more of a filler.

31.    Plaintiff was surprised to learn it was a front-page tabloid story, it contained

statements that Plaintiff never said, and many exaggerated statements to make the story more

scandalous than reality.



32.    After the Globe publication was released, Rand contacted Plaintiff and accused him

of scooping his story, and stated Plaintiff owed him part of the money Globe paid out.

33.    It is now crystal clear that no audio tape of Ricky Martin ever existed regards to the

admissions claimed made by Ricky Martin in a hotel room interview in Mexico City, Mexico. It is

also doubtful that an interview with Ricky Martin ever took place anywhere with Rand.

34.    The Plaintiff was a fool and was used by Rand to advance his elaborate scheme to

get the Menendez Brothers out of prison.

35.    Rand has admitted to the Plaintiff of illegally creating evidence in the Menendez Brothers murder case that are simply made-up, forged and fake.

36.    The most recent evidence Robert Rand created, was paying and convincing a former contracted member of MENUDO Roy Rosello to fabricate a story that he had been sexually assaulted by Jose Menendez.

37.    After Plaintiff viewed the NBC produced show "MENENDEZ+MENUDO BOYS BETRAYED" Rand telephoned Plaintiff for his thoughts, the Plaintiff told Rand: "You paid this guy [Roy] to lie", Rand responded: "no, I paid him for content", (meaning pictures, videos or other things Roy owned that was used in the broadcast).

38.    Below are links to five notable, detailed voice messages, left on the Plaintiffs' telephone by Robert Rand (dozens more are available):

a.    Rand Voice Mail March 13, 2021, at 03:21 PM, Asking Plaintiff to return his call so to review portions of his Ricky Martin audio taped interview. Clink link to hear the voice message: https://youtu.be/1LsdIzVYEhM

b.    Rand Voice Mail March 16, 2021, at 01:34 AM, Says Dateline NBC offered him big money for his Ricky Martin audio taped interview. Clink link to hear the voice message: https://youtu.be/7EXhcr_yQWg

c.    Rand Voice Mail August 03, 2021, at 11:05 PM, Says has a contract. And money offer for Plaintiff Darrin McGillis interview. Clink link to hear the voice message: https://youtu.be/eB0DxUtWQNM

d.    Rand Voice Mail December 07, 2021, at 12:37 AM, Says has a firm offer, that it is happening, wants to talk serious business for interview with Plaintiff. Clink link to hear the voice message: https://youtu.be/8TGYg1CeMdg

     e. Rand Voice Mail February 07, 2022, at 09:35 AM, Says signed a production deal and has money, had Plaintiff signed money would already be in your hands. Clink link to hear the voice message:

## D. Former contracted MENUDO member Roy Stephan Rosselló Díaz ("Roy")

39.    Sadly, after Roy's contract with MENUDO concluded, he never successfully returned to the entertainment world, as hard-core drugs had taken over his life.

40.    Roy, as a younger adult was in several homosexual relationships with older men that left him bitter, combined with his drug use Roy has never found a path to success after leaving MENUDO. Roy has been angry at everyone except himself.

41.    On September 14, 2014, the seventh season of a Brazilian reality television show titled "A Fazenda 7" premiered,[8] a total of 17 contestants competed for the first prize of 2 million Brazilian reais (about $350,000.00 US Dollars).

42.    Roy competed in the program and in a misguided attempt to gain public votes and Sympathy he fabricated a story of being sexually assaulted while a contracted member of MENUDO, he told the fabricated story to another contestant, and it aired on the program. Roy was eliminated from the show, making it only to the third episode.

43.    Roy has since been interviewed multiple times over the years in both audio and video programs with each interview contradicting the previous statements, repeatedly.

44.    NBC produced MENENDEZ+MENUDO BOYS BETRAYED based exclusively on the fabricated story of Roy. NBC through its producer Robert Rand paid Roy a substantial amount of money to purchase exclusively Roy's fabricated statements that he was sexually assaulted by Jose Menendez.

---

[8] "A Fazenda 7" was based off the American CBS television series BIG BROTHER.

45.     NBC paid a substantial amount of money for **Roy Stephan Rosselló Díaz ("Roy")** to lie and deceive its viewers. NBC went from Reporting the News to Intentional, Willful, and Malicious Libel and Slander.

### E.  A small-town family create a multi-million-dollar music enterprise

46.     Padosa America, Inc., formerly known as Padosa Productions, Inc. (Producciones Padosa, Inc.), herein after referred to as ("Padosa") was the original owner of the brand name MENUDO. Padosa was a small-town, family-owned business that employed Edgardo Diaz Melendez ("Edgardo") the nephew and son of the corporate partners.

47.     Edgardo was responsible for writing and producing multiple hit records for MENUDO including the 1983 hit "If You're Not Here (By My Side)" ("Si Tú No Estás,"), thus causing Edgardo to become the face of the mega success of the trade name MENUDO.

48.     MENUDO continued to be owned and controlled by Padosa until financial mismanagement forced the family through the corporation to sell the trade name of MENUDO.

49.     On August 31, 1987, international music executive Jose Antonio Jimenez and his company Beresford Finance & Trade, Inc., purchased the trade name of MENUDO from Padosa for $250,000.00 U.S. dollars. **(Exhibit "C")** [9]



[10]

---

[9] The Plaintiff Darrin McGillis has multiple investments and contractual relations with Jose Antonio Jimenez and his company Beresford Finance & Trade, Inc., many include transferring exclusive rights to the brand name MENUDO to the Plaintiff.
[10] Pictured from left to right, Jose Antonio Jimenez, Mickey Garcia, Darrin McGillis and Edgardo Diaz.

50.     At a meeting called and held on July 5, 1988, of the Board of Directors of Padosa America, Inc., formerly known as Padosa Productions, Inc. (Producciones Padosa, Inc.), it was resolved and approved, by unanimous vote, that the President of the Corporation be authorized to file a Chapter 7 Petition, in U.S. Federal District Court of Puerto Rico, "The Financial situation of the corporation is seriously difficult, and thus unable to pay its debts or to carry out reorganization in order to continue operations."

51.     On July 18, 1988, Padosa America, Inc., filed a Chapter 7 Petition in the United States Bankruptcy Court for the District of Puerto Rico, Case #88-01981. **(Exhibit "D")**

**52.**     On October 11, 1988, Padosa filed an amendment to the Petition to item 14b indicating the August 31, 1987, sale of the trade name of MENUDO. **(Exhibit "E")**

53.     On July 29, 1992, Puerto Rico's Chief, U.S. Bankruptcy Judge Enrique S. Lamoutte entered an Order and Final Decree, indicating this is a no asset case, and closing the Chapter 7 case and discharging all Padosa's debts. **(Exhibit "F")**

54.     At no time had any contracted MENUDO member ever brought a claim against Padosa and/or any of its officers, agents and/or employees. No debt was discharged for any claims by any contracted MENUDO member, (as none existed). Padosa having successfully filed Chapter 7 and its debts fully discharged meant that Padosa owes no one person and/or company any financial obligation.

55.     On October 24, 1994, Edgardo Diaz Melendez, filed a Chapter 7 Petition in the United States Bankruptcy Court for the District of Puerto Rico, Case #94-05739. **(Exhibit "G")**

56.     Upon information and belief in 1995, the Bankruptcy Court for the District of Puerto Rico discharged all of Edgardo's debts and found it was a no asset case.

57.     At no time had any contracted MENUDO member ever brought a civil claim against Edgardo Diaz Melendez. No debt was discharged for any civil claims by any contracted MENUDO member, (as none existed). Edgardo having successfully filed Chapter 7 and his debts being fully discharged meant that Edgardo owes no one person and/or company any financial obligations up to and including the date of discharge by the U.S. District Court of Puerto Rico.

58.     Edgardo said it best in a 1983 interview with Geraldo Rivera: "I don't know too much about business, I, I, really know [only] about produce [music for] the group". Click link to watch on YouTube: https: youtu.be akw5c0YSYhs



**F.  Defamation That Is the Subject of This Complaint**

59.     NBC cared only to get paid subscribers to its PEACOCK TV LLC.

60.     The Plaintiff brings this action to vindicate the reputation of the MENUDO name and to establish NBC's liability for the harm it has caused to its reputation by the false, defamatory, and inflammatory mischaracterizations of the Plaintiff MENUDO. The Plaintiff seeks an award of compensatory damages for the reputational harm caused by NBC and, given the willful and malicious nature of NBC's conduct that is intended to interfere with the Plaintiff's career, the Plaintiff also seeks an award of punitive damages. The Plaintiff requests compensatory damages in an amount in excess of the $75,000.00 jurisdictional limit, as to be determined at trial, and punitive damages in the amount of $500,000,000.00.

**Claims for Relief**

**Count I – Defamation Per Se**

61.     The Plaintiff repeats and re-alleges paragraphs 1- 60 of this Complaint, inclusive, as if fully stated herein.

62.     NBC has published and broadcast the show "**MENENDEZ+MENUDO BOYS BETRAYED**" in relation to the Plaintiff MENUDO and repeatedly, both in articles on as well as in broadcasts on its numerous news channels and streaming services including through its website at https://www.peacocktv.com/ (the "Peacock Website") and/or its mobile application(s) and/or set-top device(s) (the "Peacock Apps").



63.     The defamatory statements, which associate the Plaintiff MENUDO with that of underaged sexual relations with its contracted members, are reasonably understood to be statements of fact (as opposed to hyperbole or mere opinion) regarding the Plaintiff and were reasonably understood by readers and viewers to be statements of fact (and not hyperbole or mere opinion): readers and viewers understood that the Plaintiff MENUDO would be involved in criminal conduct involving its past members.

64.     These statements are false and defamatory per se.

65.     Injury to the name MENUDO and reputation is readily apparent. Indeed, animus toward MENUDO, it's current and former members, executives, family, and those who are associated with the Plaintiff MENUDO, is well-recognized by the public.

66.     By publication of these defamatory statements, NBC has incited readers and viewers to hate, contempt, distrust, ridicule, and even fear Plaintiff MENUDO, causing injury to the Plaintiff, the Plaintiff's reputation, and the Plaintiff's career.

67.     NBC published these defamatory statements with actual malice in that they knew the association of MENUDO with that of underaged sexual relations with its contracted members was false, defamatory, and inflammatory or they published the statements with reckless disregard for their truth or falsity. NBC did so in order to gain viewers and paid subscriptions to its streaming channel.

68.     These defamatory statements were made by each commentator in the course and scope of their employment relationship and/or agency relationship with NBC, thus making NBC vicariously liable for any and all damages resulting from each commentator's tortious conduct, in addition to NBC being directly liable for the publication of false statements and for its failure to exercise due care to prevent publication or utterance of such statements.

69.     NBC has used the term underaged sexual relations with its contracted members of MENUDO in relation to the Plaintiff MENUDO to associate MENUDO with criminal conduct, intentionally, willfully, maliciously, and in conscious disregard of the truth to do the Plaintiff MENUDO harm and to betray MENUDO's image and reputation to NBC's audience.

70.     As a result of NBC's libelous and slanderous associations between the Plaintiff and underaged sexual relations with its contracted members of MENUDO, NBC readers and viewers

(and readers and viewers of follow-on articles and broadcasts) identify MENUDO as a criminal organization.

71.     NBC had no applicable privilege or legal authorization to publish these false and defamatory statements or, if they did, they abused that privilege.

72.     These defamatory statements have been repeated and republished in other media outlets, which was reasonably foreseeable because NBC is a national news organization with a broad national and international audience. At the time these statements were published, NBC knew they would be republished and disseminated to other and larger audiences.

73.     NBC is liable for compensatory damages arising from its defamation of the Plaintiff MENUDO.

74.     NBC is also liable for punitive damages because of the wanton and outrageous nature of the defamation. The actions of NBC presented in this Complaint demonstrate common law express malice, actual malice, egregious defamation, and insult. Such actions by NBC were undertaken with (1) maliciousness, spite, ill will, vengeance, and/or deliberate intent to harm the Plaintiff MENUDO, and with (2) reckless disregard of the falsity of their speech and its effects on the Plaintiff MENUDO. Such actions by NBC in fact did harm the Plaintiff. Specifically, the factors justifying punitive damages include, at a minimum, the following:

a.     By stating as fact that Plaintiff MENUDO is involved in underaged sexual relations with its contracted members and repeatedly using this inflammatory language, NBC knowingly made false and defamatory statements about the Plaintiff MENUDO, or at the very least, made those statements with reckless disregard for their truth or falsity, thereby acting with actual malice;

b.   NBC knew that its false and defamatory statements about the Plaintiff MENUDO would infringe MENUDO's rights and damage MENUDO's reputation;

c.   NBC made false and defamatory statements about the Plaintiff with common law express malice;

d.   NBC engaged in willful, wanton, and intentional misconduct in making false and defamatory statements about the Plaintiff MENUDO;

e.   The articles, news reports, and social media posts containing the false and defamatory statements about the Plaintiff MENUDO remain available to a worldwide audience on NBC's website and social media webpages.

75.   Because at the time of injury NBC had a specific intent to harm the Plaintiff MENUDO and because NBC's conduct did in fact harm MENUDO, there is no statutory cap on punitive damages, and the Plaintiff MENUDO may recover in excess of $2 million and in excess of four times his actual damages – the limits that Florida law otherwise would provide.

**Count II – Defamation**

76.   The Plaintiff repeats and re-alleges paragraphs 1- 75 of this Complaint, inclusive, as if fully stated herein.

77.   NBC has published and broadcast the show "**MENENDEZ+MENUDO BOYS BETRAYED**" in relation to the Plaintiff MENUDO repeatedly, both in articles on as well as in broadcasts on its numerous news channels and streaming services including through its website at https://www.peacocktv.com/ (the "Peacock Website") and/or its mobile application(s) and/or set-top device(s) (the "Peacock Apps").

78.   These defamatory statements, which associate the Plaintiff MENUDO with that of underaged sexual relations with its contracted members are reasonably understood to be statements

of fact (as opposed to hyperbole or mere opinion) regarding the Plaintiff MENUDO and were reasonably understood by readers and viewers to be statements of fact (and not hyperbole or mere opinion): readers and viewers understood that the Plaintiff MENUDO would be involved in criminal conduct involving its past members

79.     These statements are false and defamatory.

80.     By publication of these defamatory statements, NBC has incited readers and viewers to hate, contempt, distrust, ridicule, and even fear the Plaintiff, causing injury to MENUDO, the Plaintiff's reputation, and MENUDO's career.

81.     NBC published these defamatory statements with actual malice in that they knew the association of MENUDO with that of underaged sexual relations with its contracted members was false, defamatory, and inflammatory or they published the statements with reckless disregard for their truth or falsity. NBC did so in order to gain viewers and paid subscriptions to its streaming channel.

82.     These defamatory statements were made by each commentator in the course and scope of their employment relationship and/or agency relationship with NBC, thus making NBC vicariously liable for any and all damages resulting from each commentator's tortious conduct, in addition to NBC being directly liable for the publication of false statements and for its failure to exercise due care to prevent publication or utterance of such statements.

83.     NBC has used the term underaged sexual relations with its contracted members of MENUDO in relation to the Plaintiff MENUDO to associate MENUDO with criminal conduct, intentionally, willfully, maliciously, and in conscious disregard of the truth to do the Plaintiff MENUDO harm and to betray MENUDO's image and reputation to NBC's audience.

84.     As a result of NBC's libelous and slanderous associations between the Plaintiff and underaged sexual relations with its contracted members of MENUDO, NBC readers and viewers (and readers and viewers of follow-on articles and broadcasts) identify MENUDO as a criminal organization.

85.     NBC had no applicable privilege or legal authorization to publish these false and defamatory statements or, if they did, they abused that privilege.

86.     These defamatory statements have been repeated and republished in other media outlets, which was reasonably foreseeable because NBC is a national news organization with a broad national and international audience. At the time these statements were published, NBC knew they would be republished and disseminated to other and larger audiences.

87.     Plaintiff alleges damages as a direct and proximate result of NBC's defamatory actions, including that the MENUDO has suffered and continues to suffer damage, including, but not limited to, damage to his reputation, embarrassment, pain, humiliation, and mental anguish.

88.     NBC is liable for compensatory damages arising from its defamation of MENUDO.

89.     NBC is also liable for punitive damages because of the wanton and outrageous nature of the defamation. The actions of NBC presented in this Complaint demonstrate common law express malice, actual malice, egregious defamation, and insult. Such actions by NBC were undertaken with (1) maliciousness, spite, ill will, vengeance, and/or deliberate intent to harm MENUDO, and with (2) reckless disregard of the falsity of their speech and its effects on MENUDO. Such actions by NBC in fact did harm MENUDO. Specifically, the factors justifying punitive damages include, at a minimum, the following:

        a.  By stating as fact that Plaintiff MENUDO is involved in underaged sexual relations with its contracted members and repeatedly using this inflammatory language,

NBC knowingly made false and defamatory statements about the Plaintiff MENUDO, or at the very least, made those statements with reckless disregard for their truth or falsity, thereby acting with actual malice;

b.   NBC knew that its false and defamatory statements about the Plaintiff MENUDO would infringe MENUDO's rights and damage MENUDO's reputation;

c.   NBC made false and defamatory statements about the Plaintiff with common law express malice;

d.   NBC engaged in willful, wanton, and intentional misconduct in making false and defamatory statements about the Plaintiff MENUDO;

e.   The articles, news reports, and social media posts containing the false and defamatory statements about the Plaintiff MENUDO remain available to a worldwide audience on NBC's website and social media webpages.

90.   Because at the time of injury NBC had a specific intent to harm the Plaintiff MENUDO and because NBC's conduct did in fact harm MENUDO, there is no statutory cap on punitive damages, and the Plaintiff MENUDO may recover in excess of $2 million and in excess of four times his actual damages – the limits that Florida law otherwise would provide.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands:

a)   Compensatory damages in an amount in excess of the $75,000.00 jurisdictional limit, to be specifically determined at trial; and

b)   Punitive damages in the amount of $500,000,000.00; and

c)   All taxable litigation costs, pre-judgment interest, and post-judgment interest; and

d)   For injunctive relief as pleaded or as the Court may deem proper; and

e) A trial by jury.

**Dated:** April 24, 2025,

**Respectfully Submitted,**

**Darrin McGillis d/b/a MENUDO**
P.O. Box 56-6091
Miami, Florida 33256
**Telephone:** (305) 460-3547
**Email:** darrinmcgillis@yahoo.com